## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CEPHAS B. JIMMY, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : CIVIL ACTION |
| v. | : |
| | : NO. 11-7858 |
| ELWYN, Inc., | : |
| | : |
| Defendant. | : |

**MEMORANDUM**

TUCKER, C.J.                                                    February __18th__, 2014

Presently before the Court are Defendant Elwyn, Inc.'s Motion for Summary Judgment

(Doc. 21), Plaintiff Jimmy's Memorandum in Opposition (Doc. 22), Defendant's Reply to

Plaintiff's Response to Motion for Summary Judgment (Doc. 25), and Plaintiff's Reply Brief in

Opposition to Defendant's Motion for Summary Judgment (Doc. 26).  Upon consideration of the

parties' motions with briefs and exhibits, and for the reasons set forth below, Defendant's

Motion for Summary Judgment is **DENIED IN PART AND GRANTED IN PART.**

## I.    FACTS AND PROCEDURAL BACKGROUND[1]

Because the Court writes primarily for the parties, The Court sets forth only those facts

that are relevant to its conclusion.  Cephas B. Jimmy ("Jimmy") began working with Elwyn, Inc.

("Elwyn"), a company providing caretaking services for those with developmental disabilities,

on or around February 4, 2002 as a Residential Living Staff ("RLS").  From the period of

February 2002 to January 2009, Jimmy states that he was consistently told by Elwyn that he was

a good employee. (Compl. at ¶ 11.)  On or around January 16, 2009, Jimmy gave an oral

---

[1] Though each party submitted an Undisputed Statement of Facts, many of the points made were indeed disputed by
the other party.  The facts described herein are undisputed unless otherwise noted.  When in dispute, all reasonable
inferences will be drawn in Jimmy's favor as the non-moving party.

deposition in a case brought by a former employee of Elwyn named Sarangbe Keita ("Ms. Keita"), who was then suing the company for national origin discrimination, hostile work environment, and retaliation under common law, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the Pennsylvania Human Relations Act ("PHRA"). (Pl.'s Ex. D and P-36.)

Jimmy alleges that after his testimony he was admonished for his statements by his then supervisor, Ellen Williamson ("Ms. Williamson"). (Pl.'s Concise Statement of Disputed Facts at ¶ 8.) Jimmy asserts that after he gave this testimony, which was perceived as favorable to Ms. Keita, he was called a "bad employee" by management and subjected to derogatory name-calling by supervisors at Elwyn. (Compl. at ¶ 12.) Furthermore, Jimmy contends that he was given some of the most difficult tasks to complete and was sent home repeatedly when he complained. (Pl.'s Mem. in Opp'n to Mot. Summ. J. at 3.)

The RLS position at Elwyn, Jimmy claims, required the supervision of clients needing varying levels of care as determined by the company's behavioral specialists. (Pl.'s Concise Statement of Disputed Facts at ¶ 3.) Elwyn clients who were a danger to themselves and to others were considered "one-on-one" clients while those that needed to be visible at all times were called "field-of-vision" clients. (Id. at ¶ 3.) Every RLS received a book of clients assigned to him or her and was responsible for those clients during his or her shift. (Pl.'s Concise Statement of Disputed Facts at ¶ 4.) An RLS' duties also included taking clients to the hospital, running errands, and possibly performing further tasks assigned by a supervisor. An RLS may also be asked by a co-worker or supervisor to monitor the client of another RLS temporarily. (Pl.'s Concise Statement of Disputed Facts at ¶ 5; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 5.)

2

On July 15, 2009, Jimmy states, he was asked to transport a wheelchair-bound patient to a hospital appointment. (Compl. at 15; Answer at 15; Pl.'s Concise Statement of Disputed Facts at ¶ 15; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 15.)  Jimmy asked for map directions and the assistance of another staffer and refused to complete the task unless another staff member was provided. (Pl.'s Concise Statement of Disputed Facts at ¶ 15; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 15.)  Jimmy was denied the additional staffer and the parties disagree as to whether Elwyn policy required the additional help. (Pl.'s Concise Statement of Disputed Facts at ¶ 15; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 15.)  Ms. Williamson then suspended Jimmy for three days for refusing to perform a reasonable task, a suspension which Jimmy claims was based on a false charge. (Compl. at 15; Answer at 15; Pl.'s Concise Statement of Disputed Facts at ¶ 15; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 15.)

Jimmy maintains he was sent home three more times in 2009 after his deposition. (Pl.'s Concise Statement of Disputed Facts at ¶ 16.)  This included a September 2009 suspension that occurred after a supervisor sent Jimmy on a special assignment while Jimmy was looking after patient Jerry Jackson ("Mr. Jackson"). (Pl.'s Concise Statement of Disputed Facts at ¶ 17; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 17.)  During the assignment, another staffer was supposed to be watching Mr. Jackson while Jimmy was away.  This staffer failed to supervise Mr. Jackson however, and the patient was found wandering in a neighboring building. (Pl.'s Concise Statement of Disputed Facts at ¶ 17; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 17.)  The parties disagree as to whether the other staffer involved was punished as well. (Pl.'s Concise Statement of Disputed Facts at ¶ 17; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 17.)  Jimmy alleges that he frequently made complaints

3

regarding his suspensions, which he perceived of as retaliatory. (Pl.'s Concise Statement of Disputed Facts at ¶ 17-19.)

On August 23, 2010, Elwyn hired Rene Russell ("Ms. Russell") as a Unit director and Jimmy's new supervisor. (Russell Dep. at 5:15-6:13.) Months later, on December 22, 2010, Jimmy contends that he was caring for patients already on his book, including a field-of-vision client, when he was asked to take care of an additional field-of-vision client named Napoleon Tucker ("Mr. Tucker"). (Pl.'s Concise Statement of Disputed Facts at ¶ 22.) Mr. Tucker was a man over 60 years in age but suffered from "moderate mental retardation and Paranoid Schizophrenia." (Pl.'s Ex. P-4.) In addition, Mr. Tucker had the mental age of a nine year-old and had acted out violently on occasion. (Id.) Jimmy asserts that he was given this assignment by Elwyn Supervisor Amanda David ("Ms. David") even though he complained that he already had a field-of-vision client for whom he was caring. (Pl.'s Concise Statement of Disputed Facts at ¶ 22.) Jimmy further states that Mr. Tucker could not sit with Jimmy's other patients because of Mr. Tucker's violent tendencies. (Id.) As a result, Jimmy says, Mr. Tucker was left in a dining room at Smith Hall Facility while Jimmy's other patients were gathered in another room. (Id.) Jimmy then contends that Mr. Tucker shut the door to the dining room, which prompted Jimmy to open the door and attempt to place a stopper under it to prop it open. (Id.) Ms. Russell then saw his actions, Jimmy claims, and accused him of placing the stopper under the door in order to keep Mr. Tucker trapped in the dining room. (Id.) Ms. Russell gave Jimmy a verbal warning and asked Ms. David to send him home pending an investigation. (Id.) On January 7, 2011, after an investigation into the matter, Elwyn terminated Jimmy for failing to provide an "appropriate level of supervision" for Mr. Tucker and for "implementing an unauthorized

4

restraint" on Mr. Tucker's freedom. (Compl. at ¶ 18; Pl.'s Ex. P-22; Pl.'s Concise Statement of
Disputed Facts at ¶ 22-23.) Jimmy denies any such action. (Compl. at ¶ 19.)

On December 27, 2011, Jimmy filed a Complaint with the Eastern District of
Pennsylvania for national origin discrimination in violation of Title VII, race discrimination in
violation of § 1981, race/national origin discrimination in violation of the PHRA, retaliation in
violation of Title VII, retaliation in violation of the PHRA, and retaliation in violation of § 1981.
These claims were based on both the July 2009 suspension and Jimmy's ultimate suspension and
termination in December 2010 and January 2011, respectively. On October, 1, 2012, this Court,
in response to a motion to dismiss by Elwyn and a motion for clarification by Jimmy, issued an
order marking the July 2009 incident as time-barred as the basis of a separate claim for recovery.
After a period of discovery, Elwyn submitted a Motion for Summary Judgment, which was
followed by supporting documents from both parties. The motion contends, among other
arguments, that each of the claims presented by Jimmy should be dismissed as Jimmy has not
met his burden of establishing prima facie discrimination and retaliation claims. The Court's
analysis follows.

## II.    STANDARD OF REVIEW

Summary judgment is awarded only when "there is no genuine issue as to any material
fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a);
*Liberty Mut. Ins. Co. v. Sweeney,* 689 F.3d 288, 292 (3d Cir. 2012). A factual dispute between
the parties will not defeat a motion for summary judgment unless it is both genuine and material.
*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986); *Dee v. Borough of Dunmore,*
549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a
verdict for the non-movant, and it is material if, under the substantive law, it would affect the

outcome of the suit. *See Anderson*, 477 U.S. at 248; *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249 (citations omitted); *Jiminez v. All American Rathskeller, Inc.,* 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Communications, Inc.*, 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. *See, e.g., Love v. Rancocas Hosp.*, 270 F.Supp.2d 576, 579 (D.N.J. 2003); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F.Supp.2d 324, 330 (D.N.J. 2002).

## III. DISCUSSION

Elwyn has filed a Motion for Summary Judgment arguing that: (1) Jimmy's claims of national origin discrimination under Title VII and the PHRA (Counts I and III) fail because

6

Jimmy has failed to provide evidence that creates an inference of discrimination and Jimmy has

not shown that Elwyn's non-discriminatory reason for its actions was pretextual; (2) Jimmy's

claims of race discrimination under § 1981 (Counts II and VI) fail because Jimmy has provided

only facts that support a national origin discrimination claim and such actions are not available

under § 1981; and (3) Jimmy's claims of retaliation under Title VII and the PHRA (Counts IV

and V) fail because Jimmy does not show that his testimony was a but-for cause of his adverse

employment action.[2]  The Court will address each of these arguments in turn.

## A. Jimmy's Claims of National Origin Discrimination Under Title VII and the PHRA (Counts II and III)

### 1. Jimmy has Established a Prima Facie Case of National Origin Discrimination

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Likewise, the PHRA

prohibits an employer from discharging or otherwise discriminating against an employee based

---

[2] Elwyn also argues that the plaintiff has waived his claims of race discrimination and retaliation pursuant to U.S.C. § 1981 and the PHRA (Counts II, III, V, and VI) due to inadequate briefing. In support of this proposition, Elwyn cites one case: *National R.R. Passenger Corp. v. Pennsylvania Public Utility Com'n*, 342 F.3d 242 (3d Cir. 2003). Though a party may waive an issue by no longer addressing it, Jimmy clearly intends to keep the issue alive as is stated in his Reply Brief in Opposition to Defendant's Motion for Summary Judgment. (Pl.'s Reply. in Opp'n to Mot. Summ. J. at 2-3.) Additionally, the Court notes a number of examples in which courts in this circuit have gone on to consider the merits of an issue despite poor briefing. *See e.g., National R.R. Passenger Corp.*, 342 F.3d at 259 n.14 ("SEPTA argues that the PUC failed to adequately brief the *Rooker-Feldman* issue and consequently waived the claim. . . . Although we agree that the PUC's analysis is lacking, we will decide the issue on the merits."); *Progressive Pipeline Mgmt., LLC v. N. Abbonizio Contractors, Inc.*, Civil Action No. 10-4551, 2011 WL 1343031, at *8 n.5 (E.D.Pa. Apr. 7, 2011) ("Arch does not present any explanation as to why it is entitled to a stay. Nor does it provide the Court with any citation to support this position. . . . Notwithstanding the inadequate briefing on this issue, our independent review of the caselaw confirms that a stay is appropriate."). As such, the Court will consider the merits of each of Jimmy's claims.

on that employee's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability . . . ." 43 Pa. Stat. Ann. § 955(a).

Claims brought under both Title VII and the PHRA are analyzed under the same burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See also Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001)) ("The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.").

Under the *McDonnell* framework, a plaintiff alleging workplace discrimination bears an initial burden of establishing a prima facie case of race discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell*, 411 U.S. at 802). To establish this prima facie case under Title VII and the PHRA, the plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse employment action could give rise to an inference of intentional discrimination. *Makky*, 541 F.3d at 214.

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to provide evidence of a non-discriminatory reason for the adverse employment action. *Id.* This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted). Once this burden is met, the plaintiff then must demonstrate that the defendant's reason for the adverse employment decision was simply a pretext for discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999).

8

To make a showing of pretext the plaintiff must satisfy the test pronounced in *Fuentes v. Perskie*, by which, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). This must be done by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (citing *Fuentes*, 32 F.3d at 765) (internal quotation marks and citations omitted) (emphasis in original).

The first three elements of the prima facie test are not in dispute in this case. Elwyn argues that Jimmy has not met his burden of showing a prima facie case of racial discrimination because he has not produced evidence of circumstances that would give rise to an inference of discriminatory action. (Def.'s Reply Br. in Supp. of Summ. J. at 9-10.)

Elwyn states that Jimmy fails to provide evidence of similarly situated employees who were treated differently than Jimmy. Elwyn defines "similarly situated" employees as those who failed to supervise patients or those who have committed an unauthorized restraint on patient freedom. The Court finds that this argument overlooks the fact that whether or not Jimmy actually failed to supervise patients or committed restraint on patient freedom is one of the central factual disputes in this case. (E.g., Compl. at ¶ 18-21; Pl.'s Concise Statement of

9

Disputed Facts at ¶ 22-23; Pl.'s Ex. P-20 at ¶ 12-15 *compare to* Answer at ¶ 18-21; Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 23; Pl.'s Ex. P-21 at ¶ 12-15.)

Jimmy maintains that he was instructed to look after Mr. Tucker even though he was already looking after another client. (Pl.'s Concise Statement of Disputed Facts at ¶ 22.) Jimmy further states that after Mr. Tucker closed the door to the dining room Jimmy attempted to open the door and place a door stopper under it when Ms. Russell walked by and asked why he was locking Mr. Tucker inside the room. (Id.) Jimmy claims that he told Ms. Russell that he was not closing the door on Mr. Tucker but was instead in the process of opening the door. (Id.) Jimmy says that Ms. Russell ignored his words and falsely accused him of endangering Mr. Tucker, an offense for which Jimmy was later fired. (Id. at 22-23.) Elwyn denies Jimmy's assertion that he never engaged in any unauthorized restraint. (Ans. ¶ 19.) Elwyn also asserts that Jimmy put a doorstop under the dining room door specifically for the purpose of preventing Mr. Tucker from exiting the room. (Def.'s Resp. to Pl.'s Concise Statement of Disputed Facts at ¶ 141-42.) The Court finds that whether Jimmy ultimately restrained Mr. Tucker and thus violated Elwyn's policy is a major consideration in light of the fact that Jimmy claims these accusations are false and that Elwyn is, in essence, building a paper trail of imaginary violations against him in order to terminate him without repercussion. (Pl.'s Mem. in Opp'n to Mot. Summ. J. at 3-4.)

Moreover, comparator evidence is only one way of showing a sufficient nexus between the negative employment actions taken by Elwyn and Jimmy's status as an individual of African national origin. Many different types of evidence can support an inference of impermissible discrimination. *Golod*, 403 Fed.Appx. 699, 703 n.2 (citations omitted). A plaintiff is not required to present comparator evidence to support such an inference, rather "[s]uch an inference could be supported in a number of ways, including, but not limited to, comparator evidence,

evidence of similar [impermissible] discrimination of other employees, or direct evidence of discrimination from statements or actions by [a plaintiff's] supervisors suggesting [impermissible] animus." *Id. See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("[T]he precise requirements of a prima facie [employment discrimination] case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'") (citations omitted).

Here, Jimmy's claim partially relies on evidence of similar discriminatory behavior toward other past employees of African national origin, including Wonge Walters ("Mr. Walters") (Walters Dep. at 9:5-22:6) and Ms. Keita (Pl.'s Exs. P-36-41), who previously sued Elwyn for national origin discrimination. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1086 (3d Cir. 1996) (discrimination against other employees was relevant for determining whether non-discriminatory reasons asserted by employer were pretextual); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (finding that evidence shining light on the corporate culture in which an employment decision was made was relevant to determining the presence of age discrimination). Mr. Walters, a former co-worker of Jimmy's at Elwyn, testifies pointedly that his own employment at Elwyn was terminated "[b]ecause of discrimination" and that he too was terminated after being falsely accused by Ms. Russell of violating company policy. (Walters Dep. at 9:6-10:24.)

Jimmy further provides evidence that suggests a general animus towards the African employees at Elwyn expressed through derogatory and disparaging comments from his supervisors. These include comments from Ms. Russell and Ms. Williamson telling staff that Africans were only in the country in order to take Americans' jobs, that Africans came to America to "find out how to dress," and that Africans had tails and lived in trees. (Jimmy Dep. at

48:4-50:4; 150:17-151:11.) *See Aman*, 85 F.3d at 1082 (court finds alleged conduct sufficiently severe and pervasive to constitute hostile workplace when African-American employees were referred to in "inherently racist" terms such as "one of them," "another one," or told not to steal anything); *Cardenas v. Massey*, 269 F.3d 258-63 (3d Cir. 2001) (hostile work environment claim established when Hispanic worker was asked why he anglicized his name, if he was going to pull out a switchblade during disagreements, and called a "boy from the barrio" and a "mojado," a Spanish term meaning "wetback"). On another occasion, a shop steward by the name of Joe Bradley was called upon by Elwyn to handle a dispute with Jimmy and supervisors neglected to speak out when he attempted to physically attack Jimmy. (Walters Dep. at 28:8-31:10; 71:3-75:6.)

These alleged activities and direct statements by Elwyn personnel, taken together, provide sufficient evidence to suggest a "complex tapestry" of discrimination from which a reasonable jury may find that Jimmy was subject to adverse employment actions due to his status as a person of African national origin. *See Aman*, 85 F.3d at 1082-85 (holding that a combination of actions and comments by an employer could suggest intentional discrimination); *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005) (holding that analysis of discrimination claims must focus on the whole scenario).

## 2. Jimmy has Presented Sufficient Evidence to Suggest Elwyn's Reasons for Termination are Pretextual

Elwyn next argues that, even assuming Jimmy has established a prima facie case of national origin discrimination, it has provided a non-discriminatory reason for the adverse employment action suffered by Jimmy and Jimmy fails to establish pretext under the *Fuentes* standard. *Fuentes* requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

12

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The Court finds Elwyn has met its burden with the claim that Jimmy was terminated in line with Elwyn's policies because of his alleged unauthorized restraint and failure to supervise Mr. Tucker. (Def.'s Exs. C and H.) The Court further finds, however, that Jimmy has indeed offered sufficient evidence from which a reasonable factfinder could disbelieve Elwyn's proffered reasons or believe an invidious discriminatory reason was more likely than not a motivating cause of its action.

Elwyn claims Jimmy was terminated only after an independent investigation of the circumstances found that the dining room door was purposely wedged closed and Mr. Tucker was not in Jimmy's field of vision. (Def.'s Ex. H.) This investigation was then reviewed by a panel of decision makers who signed off on the termination. (Def.'s Exs. C, E, and I.) Though Elwyn presents information that suggests that Jimmy was fired within the bounds of company policy if in fact he did restrain Mr. Tucker's freedom, Jimmy provides evidence from which a reasonable juror could find that the independent investigation was not truly independent or even biased in significant ways. Furthermore, Jimmy provides sufficient evidence from which a reasonable juror may find that the panel of decision makers simply relied on the flawed investigation report in order to come to its conclusion.

The investigator responsible for looking into Ms. Russell's allegations of patient restraint against Jimmy, Angela Sands ("Ms. Sands"), was Elwyn's Program Director for Community Residential Services at the time of the incident. (Sands Dep. at 6:7-7:23.) Ms. Sands could not recall if she had spoken to Jimmy's direct supervisor or Mr. Walters about the incident, nor did she seek to confirm whether in fact Jimmy was assigned another field-of-vision patient during

13

the incident with Mr. Tucker. (Sands Dep. at 20:13-24:20.) This was the case even though Mr.

Walters claims to have witnessed the event and there is a significant dispute regarding whether

Jimmy was actually assigned two field-of-vision patients and by whom. (Walters Dep. at 75:7-

76:10; Compl. ¶ 20 *compare* Answer ¶ 20; Pl.'s Ex. P-3 *compare* Def.'s Ex. F at 42-46.) Ms.

Sands also conducted a walk-through of the incident with Ms. Russell but neglected to conduct

one with Jimmy. (Sands Dep. at 41:14-43:3.) Finally, Ms. Sands gathered a substantial amount

of her conclusions from the words of Ms. Russell alone, placing diminished emphasis on the

factual dispute that lies at the heart of the incident.[3] (Pl.'s Ex. P-24 at 5-6; Sands Dep. at 53:14-

56:5.)

Further, Joanne Bias ("Ms. Bias"), a member of the panel that made the ultimate decision

to terminate Jimmy and the supervisor that issued his termination, testified at her deposition that

she did not know how many doors led out of the dining room in which Mr. Tucker was

---

[3] Specifically, Ms. Sands testified as follows:

**Q: Okay. Did you ask his supervisor if it was true that she was the one who assigned Mr. Napoleon Tucker to–**

A: I did not speak to the supervisor.

**Q: Okay. So why did you conclude that Sweare Torjilar was the one who assigned Mr. Tucker to Mr. Jimmy?**
A: I pulled it from – if I recall correctly, I pulled it from – I don't recall. I pulled it – either pulled it from Mr.
Torjilar's statement. It was not imperative who made the assignment to the conclusion of the investigation.

**Q: Isn't it imperative to determine if Mr. Jimmy is telling the truth or not?**

A: No.

**Q: Well, if Mr. Jimmy said he wasn't shutting the door and Ms. Russell said that he was shutting the door, one of them must be lying, right?**

A: Correct.

**Q: Well, isn't it part of your investigation to determine who is telling the truth?**

A: I don't know how to answer that. I'm sorry.

. . .

**Q: The question I'm asking you is, was it part of your investigation to determine whether it was Mr. Jimmy or Ms. Russell that was telling the truth?**

A: My role as the investigator is to pull all evidence together and make a conclusion based on the evidence provided.
**Q: I'm asking a specific question. Is it part of your investigation to determine who was telling the truth between Mr. Jimmy and Ms. Russell? That's all I want to know.**

A: Yes.

**Q: Well, did you determine if Ms. Russell was telling the truth?**

A: I pulled the evidence together and went from the evidence.

**Q: Did you determine whether it was Ms. Russell or Mr. Jimmy was telling the truth?**

A: I don't know the answer to that question.

(Sands Dep. at 53:19-54:19, 55:10-56:5.)

supposedly restrained nor did she have an idea of where Jimmy and Mr. Tucker may have been positioned during the occasion of Jimmy's alleged lack of supervision of Mr. Tucker—even though this fact is central to the determination of whether Mr. Tucker was out of Jimmy's field of vision. (Bias Dep. at 57:4-78:16.) She simply noted that she "went on the results of the investigation. (Id.) Ms. Bias also could not recall if she had ever seen Jimmy's written statement detailing his version of events, if any witnesses existed that supported Ms. Russell's statements, or even if she had ever reviewed Jimmy's personnel file. (Id.)

Here, Jimmy presents evidence from which a reasonable juror may find that a loose investigation was conducted based mostly on Ms. Russell's statements and that the investigation's conclusions were taken up wholesale, forming the basis of a dismissal rooted in impermissible discrimination.

**B. Jimmy's Claims of Racial Discrimination and Retaliation Pursuant to 42 U.SC. § 1981 and the Pennsylvania Human Relations Act (Counts II, III, V, and IV)**

### 1. Jimmy has not Established a Prima Facie Racial Discrimination Claim under § 1981 or the PHRA

Originally part of the Civil Rights Act of 1866, § 1981 prohibits racial discrimination in the creation and enforcement of private contracts. *Ladd v. Boeing Co.*, 463 F.Supp.2d 516, 524 (E.D.Pa. 2006) (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975)). Section 1981 claims follow a framework similar to Title VII claims, and establishing a prima facie case of racial discrimination under §1981 requires showing: (1) the plaintiff is a member of a protected class, (2) the plaintiff satisfactorily performed the duties required by his position, (3) the plaintiff suffered an adverse employment action, and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred

15

under circumstances that give rise to an inference of discrimination. *Langley v. Merck*, 186
Fed.Appx. 258, 259 (3d Cir. 2006). *See also Jones*, 198 F.3d at 410-12.

Here, Elwyn takes issue only with the fourth prong of the § 1981analysis. Specifically,
Elwyn contends that Jimmy fails to provide facts that give rise to an inference of racial
discrimination. Elwyn argues that Jimmy puts forward evidence only establishing national
origin discrimination claims and fails to establish a prima facie case of racial discrimination
under § 1981.

The language of § 1981 does not specifically mention race, however, in *St. Francis
College v. AlKhazraji,* the Supreme Court held that, in passing §1981, "Congress intended to
protect from discrimination identifiable classes of persons who are subjected to intentional
discrimination solely because of their ancestry or ethnic characteristics." 481 U.S. 604, 613
(1987). Thus if a plaintiff "can prove that he was subjected to intentional discrimination based
on the fact that he was born [into a particular ethnic group], rather than solely on the place or
nation of his origin . . . he will have made out a case under § 1981." *Id.* In that same case,
Justice Brennen wrote in a concurring opinion that "the line between discrimination based on
ancestry or ethnic characteristics . . . and discrimination based on place or nation of . . . origin . . .
is not a bright one." *Id.* at 614 (Brennan, J., concurring) (internal quotation marks and citations
omitted). Justice Brennan thus concluded that he "read the Court's opinion to state only that
discrimination based on *birthplace alone* is insufficient to state a claim under § 1981." *Id.*
(emphasis in original).

Reading Justice Brennan's words closely, courts in this district have repeatedly dismissed
claims that are based solely on national origin as well as claims based on national origin in
conjunction with some other nonprotected characteristics. Conversely, courts in this district have

16

permitted claims based on national origin *and* race, ethnicity, or ancestry. *Abdul v. Gamesa Technology Corp.*, Inc., Civil Action No. 11-1946, 2012 WL 1344391, at *3 (E.D.Pa. Apr. 18, 2012); *Mulholland v. Classic Management Inc.*, No 09-2525, 2010 WL 2470834, at *2 (E.D.Pa. June 14, 2010). *See e.g., Youssef v. Anvil Int'l*, 595 F.Supp.2d 547, 558-59 (E.D.Pa. 2009) (plaintiff established prima facie §1981 claim when he alleged discrimination based on both nationality and ethnicity); *Broom v. Saints Johns Neumann & Maria Goretti Catholic High Sch.*, 722 F.Supp.2d 626, 631 (E.D.Pa. 2010) (stating national original claim could not stand under §1981 but allowed §1981 claim to stand when plaintiff alleged "race and /or nationality" discrimination).

Here, although Jimmy alleges discrimination based on both "race and national origin," the Court finds Jimmy has only provided evidence supporting the national origin claim. Aside from a brief mention in the complaint that establishes his claims, Jimmy fails to mention racial discrimination in his many filings, and repeatedly refers to his protected status as coming solely from his position as a person of African national origin. (Compl. ¶ 7; Pl.'s Mem. in Opp'n to Mot. Summ. J. at 7.) Nowhere in any of Jimmy's filings has he presented evidence to establish that his adverse employment action took place in a manner giving rise to an inference of discrimination based on his ethnic characteristics or ancestry, nor does Jimmy directly address Elwyn's contentions with regard to his racial discrimination claims. Instead, Jimmy provides evidence of disparaging comments and other actions based solely on animus toward those of African origin. (Walters Dep. at 9:5-22:6; Jimmy Dep. at 48:4-50:4; 150:7-151:11.) Jimmy asks the Court to infer that a national origin claim brought by a person of African origin incorporates a racial component, yet does not point to any evidence in the record that this is the case. "Absent evidence to suggest that plaintiff's section 1981 claim rests on something other than her national

17

origin, defendant is entitled to judgment in its favor with respect to plaintiff's claim under section 1981." *Karakozova v. Trustees of Univ. of Pennsylvania*, Civil Action No. 09-02564, 2011 WL 1754468, at *6 (E.D.Pa. May 9, 2011) (citations omitted). Finally, as the PHRA follows the same analysis, Jimmy also fails to make a prima facie showing of racial discrimination under that regime.

### 2. Plaintiff's § 1981 Retaliation Claim also Fails

In *CBOCS West, Inc. v. Humphries,* the Supreme Court held that §1981 encompasses retaliation claims that arise within the workplace. 553 U.S. 442 (2008). Section 1981 retaliation claims use the same burden-shifting framework that is required under Title VII and the PHRA. *See Allen v. Nutrisystem, Inc.*, No. 13-2505, 2013 WL 6153676, at *2-3 (3d Cir. Nov. 25, 2013); *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 n.14 (3d Cir. 2010); *Jones*, 198 F.3d at 410. Establishing a prima facie case of retaliation under §1981, however, requires a showing that: (1) plaintiff engaged in protected activity, (2) the employer took adverse employment action against the plaintiff, and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action. *Aman*, 85 F.3d at 1085; *McGhee v. Thomas Jefferson Univ. Hosp.,* Civil Action No. 12-2919, 2013 WL 4663541, at *4 (E.D.Pa. Aug. 29, 2013).

Here, Elwyn argues that the "protected activity" "must relate to discrimination prohibited by § 1981, not just under any statute." *Doe v. Sizewise Rentals, LLC*, Civil Action No. 09-3409, 2012 WL 1191944, at *5 (D.N.J. Apr. 10, 2012). This conclusion is supported by other district courts of this circuit, following reasoning by the Supreme Court in *CBOCS West, Inc.* that draws a parallel between § 1981 and its neighboring statute, 42 U.S.C. § 1982. *Estate of Oliva v. New Jersey*, 579 F.Supp.2d 643, 665 (D.N.J. 2008) (citing *CBOCS West, Inc.*, 553 U.S. at 446);

*Lande v. City of Bethlehem*, Civil Action No. 07-2902, 2010 WL 5173154, at \*7 (E.D.Pa. Dec. 10, 2010).

In response, Jimmy does not counter this statement of law but merely states that the protected activity from which this claim arises was Jimmy's deposition in a case by former employee, Ms. Keita, involving race and national origin. (Pl.'s Ex. P-36.)  Yet nowhere in Ms. Keita's complaint is it apparent that she was suing because of discrimination based on race, ethnic characteristics or ancestry. (Id.)  The complaint, among other examples, notes that "[p]laintiff's protected class under the applicable statutes in this case is her national origin, which is Ivory Coast, West Africa." (Id. at ¶ 7.) The complaint also made note of derogatory comments made about Ms. Keita's national origin and stated that "African American employees and Caucasian employees who are not of the same protected class as [Keita] were regularly given more favorable treatment than Plaintiff." (Id. at ¶ 11-12.)  It is true that the complaint includes a routine count for retaliation under § 1981. (Id. at ¶ 44-46.)  However the count provides no specific information focusing on racial discrimination, and the substance of the complaint along with the entire action centers on discrimination based on national origin rather than race. (Id.)  Therefore, since Jimmy's retaliation claim is based on activities not protected under § 1981, his claim cannot stand.

### C. Jimmy's Claims of Retaliation Based on National Origin Discrimination Under Title VII and the PHRA (Counts IV and V)

#### 1. Plaintiff fails to make a Prima Facie Case of Retaliation under Title VII and the PHRA

Like the § 1981 retaliation claim noted above, retaliation claims under Title VII and the PHRA employ the burden-shifting *McDonnell* framework.  Establishing a prima facie case requires showing that: (1) plaintiff engaged in protected activity, (2) the employer took adverse

19

employment action against the plaintiff, and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-42 (3d Cir. 2006). Additionally, the Supreme Court has recently clarified that, regarding the third prong of the prima facie analysis, a plaintiff making a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013); *see also Verma v. Univ. of Pennsylvania*, 533 Fed.Appx. 115, 119 (3d Cir. 2013).

This case concerns only one protected activity: the January 16, 2009 deposition, in which Jimmy gave favorable testimony on behalf of Ms. Keita in a national origin discrimination case against Elwyn. (Compl. ¶ 14-18.) Elwyn does not dispute that this was protected activity, but instead makes a number of arguments as to why no causal connection exists between this deposition and Jimmy's eventual termination. (Def.'s Reply Br. in Supp. of Summ. J. at 17.)

Elwyn argues that Ms. Russell, whose accusation of poor supervision led to Jimmy's termination, was hired nineteen months after the 2009 deposition and therefore was not negatively influenced by Jimmy's protected action. Elwyn also argues that Ms. Russell was not the ultimate decision maker and that she was only one of a panel of six administrators that approved Jimmy's termination. Elwyn points to Ms. Russell's testimony that she had zero involvement in the ultimate decision to terminate Jimmy. (Id. at 18; Russell Dep. at 15:19-22.) Elwyn also contends that the causal link between Jimmy's January 16, 2009 deposition and the January 7, 2011 termination is too attenuated. Primary intervening actions include an investigation into Ms. Russell's accusation by Ms. Sands and the evaluation of a panel of decision-makers from Elwyn.

20

In the case that the Court rejects these arguments, Elwyn argues that Jimmy may not establish causation on the basis of temporal proximity because too much time passed between Jimmy's deposition and his ultimate termination. Elwyn also argues that their summary judgment motion should be granted because Jimmy has failed to establish that his 2009 testimony was the "but for" cause for his termination and not simply a motivating factor. Finally, Elwyn argues that if Jimmy is able to meet his prima facie case of national origin retaliation, they have provided a legitimate, non-discriminatory reason for the adverse action. Namely, that Jimmy was fired for unauthorized restraint of patient freedom and failure to supervise a patient.

Jimmy's deposition in the Keita case took place on January 16, 2009. He was ultimately suspended on Dec. 22, 2010 and dismissed from Elwyn on January 7, 2011. This equals a roughly two year gap between the protected activity Jimmy complains of and the adverse employment action he suffered. The Third Circuit has found that in regard to establishing a causal link for a retaliation claim, two factors play a primary role: "timing and evidence of ongoing antagonism." *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F.Supp.2d 639, 652 (E.D.Pa. 2012) (quoting *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001)). A plaintiff may also support a causal connection through other types of circumstantial evidence that support an inference of retaliation, such as inconsistent explanations. *Miller*, 908 F.Supp.2d at 652 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-82 (3d Cir. 2000).

In order for timeframe alone to provide for an inference of a causal link it must be "unusually suggestive of retaliatory motive." *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (granting summary judgment and finding nineteen month timeframe too great to infer causality based on timing alone). Here, the two year time period is too great to alone be the

21

basis of a causal link, although "mere passage of time is not legally conclusive proof against retaliation." *Aman*, 85 F.3d at 1085 (citing *Robinson v. S.E. Pa. Transp. Authority,* 982 F.2d 892, 894-95 (3d Cir. 1993)). Taking this into consideration, it may be possible for Jimmy to establish a link between the protected action and his termination by showing he was subjected to ongoing antagonism and termination due to his participation in the protected action.

Jimmy notes that after his deposition he was told by his then-supervisor, Ms. Williamson, that she was "going to get him." (Jimmy Dep. at 25:5-28:17.) Ms. Williamson, Jimmy alleges, would also make comments in the presence of Ms. David and later Ms. Russell. (Id.) On July 15, 2009, Jimmy was sent home and suspended by Ms. Williamson for allegedly refusing a reasonable assignment. (Pl.'s Ex. P-15.) Next Jimmy presents evidence that in September of 2009 he was sent home for five days when one of his assigned clients went missing while he was on an errand sanctioned by management. (Jimmy Dep. at 83:14-86:6; Pl.'s Ex. P-19.) Finally, Jimmy notes the December 22, 2010 suspension and the eventual January 7, 2011 termination due to Ms. Russell's accusation. (Pl.'s Ex. P-22.) Jimmy vaguely testifies that he was sent home a number of times in 2009 but does not say who sent him home or why. (Jimmy Dep. at 81:20-85:5.) Jimmy further fails to include any supporting documentation of these incidents. (Id.)

Jimmy asks the Court to see a possible connection between his deposition and the adverse employment actions that befell him, however, even though all factual inferences are made in the favor of the non-moving party, under the *Nassar* standard Jimmy must show evidence that suggests his 2009 deposition was the but-for cause of his adverse employment actions. *Nassar*, 133 S.Ct. at 2532-35. Jimmy has failed to do so. To rule otherwise, this Court would have to find that Jimmy presents sufficient evidence to suggest that a two-year long effort to negatively affect Jimmy's employment was orchestrated against him primarily by two managers, at least

one of whom was not employed by Elwyn at the time of the protected activity. Jimmy does not mention which supervisor sent him home in September of 2009 nor does he provide sufficient evidence to establish that these suspensions were unusual or suspicious compared to the way in which he was treated prior to the deposition. (Jimmy Dep. at 81:20-85:5.) Ms. Russell began working at Elwyn on August 23, 2010, long after plaintiff's deposition in January of 2009. (Russell Dep. at 5:15-6:13.) Jimmy presents evidence that Ms. Williamson told Ms. Russell about the deposition and openly displayed animosity to Jimmy for his role in the Keita case, though Jimmy does not present any evidence to suggest that Ms. Russell acted based on his deposition. Rather, he asks the Court to assume that just because Ms. Russell knew about his testimony against the company she would automatically view him as an enemy because of it. The Court declines to do so.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied in part and granted in part.

23